1

2

3

4

5

6                          **UNITED STATES DISTRICT COURT**

7                               **DISTRICT OF NEVADA**

8

9   LIGHTGUARD SYSTEMS, INC., a          )    3:10-cv-00737-LRH (WGC)
    California Corporation,               )
10                                        )    ORDER
                    Plaintiff,            )
11                                        )
            vs.                           )
12                                        )
    SPOT DEVICES, INC., a Nevada          )
13  Corporation,                          )
                                          )
14                  Defendant(s)          )
    _____)
15

16         Before the court are two discovery disputes.  The first concerns LightGuard Systems, Inc.

17  ("LightGuard") and Spot Devices, Inc.'s ("Spot") dispute over whether certain documents are

18  privileged ("privilege dispute"), which stems from LightGuard's Emergency Motion to Compel.

19  (Doc. #74.)[1]  The second concerns LightGuard and Spot's dispute regarding fees owed to a discovery

20  vendor, which came before the court during a January 24, 2012, status conference. (Doc. #118.)

21                               **I.  BACKGROUND**

22         The facts underlying LightGuard and Spot's discovery disputes are relatively straightforward.

23  For ease of presentation, however, the facts underlying each dispute are recounted separately.

24  *A.     LightGuard & Spot's Privilege Dispute*

25         LightGuard and Spot's privilege dispute began during two Rule 30(b)(6) depositions conducted

26  by LightGuard on November 2, 2011, and November 11, 2011.  (Doc. #74 at 3:7-23.)  LightGuard

27  asserts that Spot employees Thomas Burnham ("Burnham") and Chris Peddie ("Peddie") were

28  unprepared to testify.  (*Id*. at 1:22-14.)  Exacerbating matters for LightGuard, Spot attempted to "claw

_____

        [1] Refers to court's docket number.

back" Exhibits A-L.  (Pl.'s Privilege Br., Doc. #107 at 2:2-16.)[2]  Spot asserted a number of privilege objections with regard to the exhibits, which Spot had previously produced and LightGuard had attempted to utilize during the depositions.  (*Id*.)  Following the depositions, LightGuard and Spot were unable to resolve the dispute and, on November 21, 2011, LightGuard filed an Emergency Motion to Compel.  (Doc. #74.)

On December 5, 2011, the court held a hearing on the discovery dispute.  (Doc. #91.)  During the hearing, the court resolved all matters relating to the Burnham and Peddie depositions.  The court further ordered LightGuard and Spot to file simultaneous briefs on the privilege dispute, which concerned the two groups of documents referenced above: Exhibit A and Exhibits B-L, and also Exhibit M (Spot's privilege log).  (*Id*.)

The first, Exhibit A, is a five-page document created by Spot's vice-president, Burnham, on May 6, 2005.  (Joint Stip. Ex. List (#105) at Ex. A.)  It consists of independent research and marginal notes.  (*Id*.)  According to Spot, Exhibit A was created to assist Spot's counsel, Seed IP, in the creation of a "Freedom to Operate" ("FTO") plan.  (*Id*.)  The second group, Exhibits B-L, consists of a collection of operating plans, sales and financial reports, and PowerPoint presentations that were presented to Spot's board of directors.  (*Id*. at Ex. B-L.)  The third group, Exhibit M, is Spot's December 1, 2011, privilege log.  (*Id*. at Ex. M.)  Exhibit M identifies numerous documents (primarily emails and attachments thereto), which Spot claims are privileged.  (*Id*.)  The court ordered the parties to submit simultaneous briefs addressing whether any privileges (primarily, the attorney-client privilege and work product doctrine) attach to the aforementioned documents.

On December 30, 2011, LightGuard and Spot filed simultaneous briefs, addressing the question of whether Spot's Exhibits A, B-L, and M should be protected by the attorney-client privilege, work product doctrine, or both.  (Docs. #107, #109.)  On January 19, 2012, after reviewing LightGuard and Spot's briefs, the court sought further clarification on six discrete points and ordered the parties to file supplemental briefs as to those issues.  (Doc. #115).  Clarifying briefs were filed by the parties on

---

[2] Exhibit M is a privilege log pertaining to numerous emails and attachments.  Unlike Exhibits A-L, the emails and attachments in Exhibit M had not been previously produced to LightGuard.

2

1    January 30, 2012.  (Docs. #119, #121.)

2         On February 15, 2012, the court heard arguments on the privilege issues, discussed in greater

3    detail below, *see infra* pp. 4-5.

4    **B.    *LightGuard & Spot's Payment Dispute***

5         LightGuard and Spot's second discovery dispute, which concerns fees owed to a discovery

6    vendor, arose out of a different set of facts.  On February 22, 2011, and March 28, 2011, LightGuard

7    issued two document requests.  (Doc. #126-1.)  On July 27, 2011, and September 30, 2011, Spot

8    produced the requested documents.  (*Id*. at 5:6-14.)  Pursuant to Federal Rule of Civil

9    Procedure 34(b)(2)(B), Spot explained that the documents were available for LightGuard's inspection

10   and copying. (Doc. #123 at 2:22-28.)

11        Meanwhile, however, Spot and LightGuard exchanged a flurry of emails and letters debating,

12   first, how to produce the documents and whether to hire Sierra Legal Duplicating, Inc. ("Sierra Legal")

13   to process and copy Spot's responsive production. (*See, e.g.*, Doc. #123 at 2-4.)  The second question

14   was whether LightGuard, Spot, or both should bear the cost of Sierra Legal's services.  (Doc. #125 at

15   3-6) (recounting these events).)

16        On May 13, 2011, LightGuard invited Spot to split copying costs that would be incurred as a

17   result of hiring Sierra Legal.  (Doc. #124 at Ex. A.)  Although Spot did not directly respond to

18   LightGuard's invitation, Spot repeatedly stated that it would "not incur the cost of making copies in

19   this litigation." (Doc. #126-2 at 2.)  Despite this clear and repeated rejection of LightGuard's offer

20   (*see* Doc. #126-3 at 2, Doc. #126-4 at 3, Doc. #126-7 at 2) (stating Spot would "not incur the cost of

21   making copies in this litigation")),  LightGuard allegedly believed that a cost splitting agreement had

22   been reached.  (Doc. #123.)  However, LightGuard never confirmed this "agreement" in writing.

23   Subsequently, Sierra Legal collected, processed, and converted Spot's documents into a format

24   compatible with LightGuard's data management software.  (Def.'s Payment Br., Doc. #125 at 5:5-8.)

25        On October, 28, 2011, LightGuard and Spot received an invoice from Sierra Legal for its

26   services. (Pl.'s Payment Br.. Doc. #123 at 3:25-26.)  Assuming that Spot and LightGuard had agreed

27   to split copying costs, LightGuard only paid half of the bill, which amounted to $11,554.58.  (*Id*. at

28   1:20-21.)  Spot, however, refused to pay the other half of the bill, which amounted to $11,396.80.  (*Id.*

at 1:18-19.)  Unable to resolve the matter amicably, the parties brought the issue to the court's attention during a January 24, 2012, status conference.  (Doc. #118.)  The parties were ordered to submit briefs on the matter for the court's review, which they did on February 9, 2012.  (Doc. #123; Doc. #125; *see infra* pp. 20-22 (discussing LightGuard and Spot's payment dispute).)

**C.      *The February 15, 2012, Hearing & Subsequent Proceedings***

On February 15, 2012, the court held a hearing on both discovery disputes.  (Doc. #127.)

**I.      *Exhibit A***

Regarding Exhibit A, Spot reiterated its position that Exhibit A is protected by the attorney-client privilege and not the work product doctrine.  Spot referenced a footnote in its brief alleging that Spot sent an email to Seed IP on May 24, 2005, discussing Exhibit A's contents.  (*See* Doc. #109 at 2 n.1 ("Spot Devices can submit to the Court for *in camera* review an e-mail between Seed IP and Spot Devices on May 24, 2005 discussing the contents of Exhibit A").)  Spot could not, however, confirm whether the May 24, 2005 email was included in any of its privilege logs.  (Doc. #127.)  As a result, the court ordered Spot to provide a copy of the email for *in camera* review and ordered both parties to submit simultaneous briefs as to whether Spot's failure to include the May 24, 2005 email in a privilege log waived Spot's alleged attorney-client privilege.  (*Id*.)

**ii.      *Exhibit B-L***

With regard to Exhibits B-L, Spot stated that the exhibits are protected by the attorney-client privilege and an alleged oral agreement between LightGuard and Spot.  (*Id*.)  According to Spot, the agreement permitted LightGuard to utilize the exhibits during the deposition in exchange for LightGuard's assurances that LightGuard would *never* contest that the exhibits are privileged and that the privilege had not been waived.  (*See* Def.'s Suppl. Br., Doc. #121 at 4-6.)  As explained in greater detail below, *see infra* at pp. 14-17, the court concluded that the attorney-client privilege does not apply to Exhibits B-L.  (Doc. #127.)

**iii.      *Exhibit M***

With regard to Spot's privilege log, Exhibit M, the court was unable to determine if the documents referenced in the log complied with the factors enunciated in *Dole v. Milonas*, 889 F.2d 885, 888 n.3 (9th Cir. 1989), which requires privilege logs to identify: (1) the attorney and client

4

involved; (2) the nature of the document; (3) all person or entities shown on the document to have received the document; (4) all persons or entities known to have been furnished the document or informed of its substance; and (5) the date the document was created. *Id.*; *see also In re Grand Jury Investigation*, 974 F.2d 1086, 1071 (9th Cir. 1989) (also requiring these factors). As a result, the court ordered Spot to produce the documents listed in Exhibit M for *in camera* review in order to determine whether the attorney-client privilege applies to any of the documents. (Doc. #127.)

On February 24, 2012, LightGuard and Spot submitted briefing on whether Spot's failure to include the May 24, 2005, email in a privilege log waived Spot's alleged attorney-client privilege. (*See* Doc. #131; Doc. #132.) Spot acknowledged, *see* (Doc. #129 at 2), that its December 1, 2011, privilege log, Exhibit M, did not list the May 24, 2005, email as privileged. However, Spot submitted a new privilege log, dated January 19, 2012, which does identify the May 24, 2005, email as privileged. (Doc. #129-1; Doc. #130.) Spot also submitted the emails and attachments listed in its December 1, 2011, privilege log, Exhibit M, for *in camera* review. (*See* Doc. #131.)

### iv.    *Vendor Payment Dispute*

Finally, with regard to LightGuard and Spot's payment dispute, the court ruled that Spot shall only be liable for the costs associated with converting the documents into LightGuard's requested format. (*Id.*) Because the court could not discern the amount of those expenses from Sierra Legal's invoice, the parties were ordered to independently determine the appropriate cost. (*Id.*) If the parties were unable to agree on apportionment of expenses, the parties were to return to court with documentation.

## II. LEGAL STANDARD

The **attorney-client privilege** protects confidential communications between attorneys and clients that are made for the purpose of giving or receiving legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It extends only to communications and not to facts. *Id.*, at 395-96 (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (D. Pa. 1962)). The burden of proving the privilege rests on the party asserting the privilege. *United States v. Martin*, 278 F.3d 988, 999–1000 (9th Cir. 2002).

/ / /

5

In the Ninth Circuit, an attorney-client privilege exists (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are, at that instance, permanently protected, (7) from disclosure by the client or by the legal advisor, and (8) unless the protection is waived." 8 Wigmore, Evidence § 2292 (1961); *see also United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010). When determining whether a document seeks legal advice, courts have examined the nature, content, and context in which the document was prepared. *AT&T Corp. v. Microsoft Corp.*, 2003 WL 21212614 at *3 (N.D. Cal. 2003) (citing *Bio-Rad Lab., Inc. v. Pharmacia, Inc.*, 130 F.R.D. 116, 126 (N.D. Cal. 1990)). Blanket assertions of attorney-client privilege are "extremely disfavored." *Martin*, 278 F.3d at 1000. Because the privilege impedes full and free discovery, it is strictly construed. *Weil v. Inv. Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

By contrast, the **work product doctrine** protects attorneys' thought processes and legal recommendations. *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). To qualify for protection against discovery under the work product doctrine, documents must: (1) "be 'prepared in anticipation of litigation or for trial,' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004) (citing *In re California Pub. Utils. Comm'n*, 892 F.2d 778, 780-81 (9th Cir. 1989)). "In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (citing *In Re Grand Jury Subpoena*, 357 F.3d at 907). "Dual purpose documents are deemed prepared because of litigation if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" *Id.* In applying the "because of" standard, courts must consider the totality of the circumstances and determine whether the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation." *Id.* As in the case of the attorney-client privilege, the party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine. *Tornay v. U.S.*, 840 F.2d 1424, 1426 (9th Cir. 1988) (citing *U.S. v. Hirsch*, 803 F.2d 493, 496 (9th Cir. 1986)).

1        Finally, regarding the **document duplication expense issue**, Federal Rule of Civil

2 Procedure 34, which governs the procedures for document production, requires the responding party

3 "to produce and permit the requesting party or its representative to inspect, copy, test, or sample . . .

4 any designated documents or electronically stored information." Fed. R. Civ. Pro. 34(a)(1)(A). "[T]he

5 presumption is that the responding party must bear the expense of complying with discovery requests."

6 *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1987).  This includes the expense of

7 answering interrogatories, submitting to depositions, and producing documents for the requesting

8 party's inspection, copying, testing, or sampling.  *In re Puerto Rico Elec. Power Authority*, 687 F.2d

9 501, 508 (P.R. Cir. 1982).

10        All other expenses, however, are subject to the presumption that each party bears the "ordinary

11 burden of financing his own suit."  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 (1974).  This

12 undoubtedly includes copying expenses.  *Tierno v. Rite Aid Corp.*, No. 05-02520, 2008 WL 3876131

13 at *1 (N.D. Cal. Aug. 19, 2008) (citing 7 *Moore's Federal Practice* § 34.13[5] at 34-92 (2008)

14 ("A party producing documents will ordinarily not be put to the expense of making copies for the

15 requesting party")); *see also Bills v. Kennecott Corp.* 108 F.R.D. 459, 462 (D. Utah 1985) ("Ordinarily,

16 the producing party bears the costs of reviewing and gathering documents while the requesting party

17 pays for the costs of the copies only"); *Clear View Investments, Ltd. v. Oshatz*, 233 F.R.D. 393, 394

18 (S.D.N.Y. 2006) (stating the same); *Obiajulu v. City of Rochester, Dept. of Law*, 166 F.R.D. 293, 297

19 (W.D.N.Y. 1996) (stating the same).

20 ### III.  DISCUSSION

21 ### A.  *Exhibit A is not Protected by the Attorney-Client Privilege*

22        Exhibit A is a five-page document created by Spot's vice-president, Burnham, on May 6, 2005.

23 (Joint Stip. Ex. List, Doc. #105 at Ex. A.)  It consists of independent research and marginal notes.  (*Id*.)

24 According to Spot's arguments, the document was created to assist Spot's counsel, Seed IP, in the

25 creation of a "Freedom to Operate" ("FTO") protocol.  (*Id*.)  Spot contends that Exhibit A is protected

26 by the attorney-client privilege because "the document reveals confidential communications . . .

27 between Spot Devices and Seed IP." (Def.'s Opp., Doc. #109 at 2.)  After reviewing the parties' briefs

28 and relevant law, the court concludes that Exhibit A is not protected by the attorney-client privilege.

For ease of analysis, the court will discuss, first, why Exhibit A's four corners militate against protection and, second, why the supplemental evidence proffered by Spot (*i.e.*, the May 24, 2005 email) fails to demonstrates that Exhibit A is entitled to protection.

> ### i. *The record is adequate and the court's determination of whether Exhibit A is protected by the attorney-client privilege is ripe*

As a preliminary matter, the court addresses Spot's contention that "the current record is inadequate for the Court to be able to" determine whether the attorney-client privilege attaches to Exhibit A and the May 24, 2005, email between Spot and Seed IP, which purportedly discusses Exhibit A's contents. (Def.'s *In Cam*. Stat. Doc. #131 at 1:16-17.)  Before deciding whether the attorney-client privilege applies to disputed documents, district courts are directed to develop an appropriate record and to afford the parties an opportunity to present their arguments in writing and, if necessary, undertake an *in camera* review. *Portman v. County of Santa Clara*, 995 F.2d 898, 903 (9th Cir. 1993) (citation omitted) (stating that the prudential component of the ripeness doctrine focuses on "whether there is an adequate record upon which to base effective review"); *see also In re Pittman*, 00-7195 2000 WL 1580968 at *1 (D.C. Cir. Sept. 1, 2000) (requiring the exact procedures this court has just completed in order to establish the base of an effective review).  Because the court has afforded Spot numerous opportunities to present its arguments and has conducted an *in camera* review, the court rejects Spot's assertion that the record is inadequate.

The court has developed the record with care and has given Spot ample opportunities to present evidence demonstrating that Exhibit A is protected by the attorney-client privilege.  On December 5, 2011, and February 15, 2012, the court held hearings on whether Exhibit A is protected by the attorney-client privilege.  (*See* Doc. #91; Doc. #127.)  In addition, Spot has submitted three briefs addressing the question of whether Exhibit A is protected by the attorney-client privilege, including a supplemental brief submitted in response to the court's request for clarification.  *(See* Def.'s Br. Doc. #109 at 2; Def.'s Suppl. Br., Doc. #121 at 2; Def.'s *In Cam.* Stat., Doc. #131 at 1; *see also* Order Doc. #115 (requesting clarification from the parties).)  Finally, following the February 15, 2012, hearing, the court conducted an *in camera* review of Exhibit A and an email, dated May 24, 2005.

/ / /

1  According to Spot, the email, which was between Spot and Seed IP, allegedly discussed Exhibit A's

2  contents and communicated Exhibit A to Spot's attorneys.

3  Therefore, Spot's assertion that the record is inadequate is unfounded.  Before deciding

4  whether Exhibit A is protected by the attorney-client privilege, the court has reviewed Spot's briefs,

5  declarations, affidavits, privilege logs, requested supplemental briefs, held two hearings, and

6  conducted an *in camera* review of allegedly privileged documents.  As a result, the court will now

7  proceed to its discussion of whether or not Exhibit A is entitled to protection under the attorney-client

8  privilege.

9  ***ii.***      ***Exhibit A's four corners do not demonstrate that it is protected by the attorney-client***

10  ***privilege***

11  Exhibit A's four corners do not indicate that it is entitled to protection under the attorney-client

12  privilege.  First, Spot–upon whom the burden of proving that the attorney-client privilege applies–has

13  failed to demonstrate that Exhibit A was created for the purpose of soliciting legal advice.  *See Upjohn*,

14  499 U.S. at 389 (stating that the attorney-client privilege protects communications that are made for

15  the purpose of obtaining legal advice).  When determining whether a document seeks legal advice,

16  courts have examined the *nature*, *content*, and *context* in which the document was prepared.  *AT&T*

17  *Corp. v. Microsoft Corp.*, 2003 WL 21212614 at *3 (N.D. Cal. 2003) (citing *Bio-Rad Lab. Inc. v.*

18  *Pharmacia, Inc.*, 130 F.R.D. 116, 126 (N.D. Cal. 1990)).

19  Here, Exhibit A's *nature* appears to be an internal business memorandum.  The document's

20  introduction plainly states that it was created to review the status of various patents in order to limit

21  the amount of work Seed IP would perform.  (*See* Joint Stip. Ex. List, Doc. #105 at Ex. A.  ("Our

22  intent behind this research was to provide a thorough review of all potentially related patents in order

23  to narrow down the time/expense for Seed IP to generate an FTO")).  This language is significant for

24  two reasons.  First, taken along with the heading which identifies Burnham as the author, the

25  introduction indicates that Exhibit A was created without the assistance of counsel.  Second, the

26  inclusion of the phrase, "in order to narrow down the time/expense for Seed IP" in the introduction,

27  strongly suggests that the purpose of Exhibit A was to screen information from, rather than

28  / / /

1   communicate information to, counsel.  This conclusion is bolstered by the fact that Exhibit A is not

2   addressed to anyone and does not pose questions to anyone, counsel in particular.

3        Similarly, Exhibit A's *content* indicates that it is not entitled to protection.  Although Exhibit A

4   purports to perform a "legal review," the review was conducted by Burnham, who is not an attorney.

5   Moreover, no attorneys participated in Exhibit A's creation, as Exhibit A states, "[t]his assessment of

6   patents was compiled by Thomas Burnham, with engineering input from 219 Design." (Joint Stip. Ex.

7   List (#105) at Ex. A.)

8        Finally, the *context* in which Exhibit A was prepared does not indicate that it should be

9   protected.  Although Spot maintains that it was created in anticipation of litigation, Spot has failed to

10  direct the court's attention to a single phrase in the document suggesting as much.  Similarly, as

11  discussed below, Spot has also failed to produce any extrinsic evidence indicating that Exhibit A was

12  ever sent to an attorney or created within the context of impending litigation.  Without any evidence

13  to corroborate Spot's naked allegations, the court must conclude that Exhibit A originated in the

14  regular course of business.  That Exhibit A was intended for business purposes is, after all, strongly

15  suggested by the introduction.  It plainly states that Exhibit A was created for the purpose "of reducing

16  the number of constraints on Spot Devices' future designs." (Joint Stip. Ex. List, Doc. #105 at Ex. A.)

17  Importantly, the introduction memorializing the context of Exhibit A's creation makes no mention of

18  impending litigation.  (*Id.*)  Rather, the context appears to be simply business oriented.  The court

19  cannot, therefore, conclude that Exhibit A was created for the purpose of obtaining legal advice.

20       In addition to Spot's failure to demonstrate that Exhibit A seeks legal advice, Spot has also

21  failed to demonstrate that Exhibit A qualifies as a communication for purposes of the attorney-client

22  privilege.  Nothing within Exhibit A's four corners suggest that it is a communication.  Exhibit A's

23  format suggests that it is an internal business memorandum for Spot and Burnham's private use.  The

24  document is not addressed to anyone and contains no evidence of having been received by anyone,

25  such as a date stamp.  Exhibit A's tone and style also suggest that it is an internal business

26  memorandum and not a communication to counsel.  The document is written in a casual style, is filled

27  with hand-written notes and, as discussed above, states that it was created to screen information from,

28  rather than communicate information to, counsel.

Given that Spot has failed to demonstrate that Exhibit A was created for the purpose of obtaining legal advice or is a communication for purposes of the attorney-client privilege, the court cannot conclude that it is entitled to protection under the attorney-client privilege.

### iii.   Spot's supplemental evidence fails to demonstrate that Exhibit A is protected by the attorney-client privilege

To resuscitate its contention that Exhibit A is protected by the attorney-client privilege, Spot made various representations to the court that it could produce additional evidence demonstrating that Exhibit A is was created to obtain legal advice.  These representations, which were made initially in its briefs and subsequently at the February 15, 2012 hearing, alleged that Spot could produce a May 24, 2005 email between Spot and Seed IP discussing the contents of Exhibit A as well as a privilege log identifying the May 24, 2005, email as protected by the attorney-client privilege.  (*See* Doc. #109 at 2 n.1.)  Additionally, Spot produced a declaration by Thomas Burnham stating that Exhibit A was prepared "for the sole purpose" of obtaining legal advice.  (*See* Burnham Decl.., Doc. #122 at 1:8-11.)

Spot's representations, however, fail for several reasons.  First, during the February 15, 2012, hearing, the court noted that Spot's privilege log, Exhibit M, did not identify the May 24, 2005 email as privileged.  (Doc. #127.)  Consequently, Spot promised to provide a new privilege log, identifying the May 24, 2005 email as privileged and accurately describing its contents.  (*Id*.)  However, Spot's new privilege log, dated January 19, 2012, does not accurately represent the contents of the May 24, 2005 email.  (*See* Doc. #130 at 15.)  As discovered by the court during its *in camera* review, the January 19, 2012 privilege log states that the May 24, 2005 email seeks legal advice and was sent to three attorneys.  However, the May 24, 2005 email neither seeks legal advice nor was sent to three attorneys.

Second, in both its December 30, 2011 privilege brief and during the February 15, 2012 hearing, Spot represented that it could produce a May 24, 2005 email between Spot and Seed IP discussing the content of Exhibit A.  (*See* Doc. #109 at 2 n.1) ("Spot Devices can submit to the Court for *in camera* review an e-mail between Seed IP and Spot Devices on May 24, 2005 discussing the contents of Exhibit A").)  However, as discovered by the court during its *in camera* review, Spot's representations to the court did not accurately reflect the contents of the May 24, 2005 email.  Whereas

1    Spot assured the court that the May 24, 2005 email discussed the contents of Exhibit A, scrutiny of the

2    May 24, 2005 email reveals that it makes no mention of Exhibit A.  In fact, it does not even discuss

3    issues germane to this case or state anywhere that Spot was seeking advice or input from counsel.

4         In sum, Spot was not only slow to produce its supplemental evidence, but the evidence it did

5    produce was contradictory.  Spot's initial privilege log made no reference to the May 24, 2005 email.

6    However, when Spot did produce a privilege log identifying the May 24, 2005 email, the privilege

7    log's description of the May 24, 2005 email contradicted the email's actual contents.  The privilege

8    log states that the May 24, 2005 email seeks legal advice.  However, the May 24, 2005 email does not

9    seek legal advice.  Similarly, Spot's assertions in its brief that the "e-mail between Seed IP and Spot

10   Devices on May 24, 2005 discuss[es] the content of Exhibit A" is contradicted by what the actual

11   May 24, 2005 email addresses.  (*See* Doc. #109 at 2 n.1.)  On these facts, the court cannot conclude

12   that Spot has satisfied its burden of demonstrating that either the May 24, 2005 email or Exhibit A are

13   entitled to protection under the attorney-client privilege.

14        This leaves the Burnham declaration as only possible basis for concluding that Exhibit A might

15   be protected by the attorney-client privilege.  According to the Burnham declaration, Burnham

16   "collected the information and prepared Exhibit A for the sole purpose of presenting the information

17   to Spot Devices lawyers at Seed IP seeking advice regarding potential infringement of and the scope

18   of the patents included in the May 6, 2005 memo.  The memo was in fact given to and discussed with

19   the attorneys at Seed IP."  (Burnham Decl., Doc. #122 at 1:8-11.)

20        However, two facts detract from the credibility of the Burnham declaration.  First, the Burnham

21   declaration's unequivocal statement that Exhibit A was created "for the sole purpose of presenting the

22   information to Spot Devices lawyers at Seed IP" directly contradicts Burnham's earlier statement,

23   memorialized on Exhibit A's face, that the document was created to provide an internal review of

24   various patents.  (Burnham Decl., Doc. #122 at 1:8-11; Joint Stip. Ex. List, Doc. #105 at Ex. A.)

25   Burnham's statement written on Exhibit A's face accurately portrays the origin and purpose of

26   Exhibit A. The court notes the earlier statement was made contemporaneously with the document's

27   creation, was inscribed on its face, and was made without the assistance of an attorney.  By contrast,

28   the Burnham declaration was prepared by Spot's attorneys after the initiation of litigation.  The court

1    also notes that the Burnham declaration was only created only after Spot became aware that the court

2    may not grant Exhibit A protection under the attorney-client privilege.[3]

3           Second, the Burnham declaration states that Exhibit A "was in fact given to and discussed with

4    the attorneys at Seed IP." (Burnham Decl., Doc. #122 at 1:10-11.)  Importantly, however, the

5    declaration does not state when Exhibit A was allegedly given to Spot's attorneys, how it was allegedly

6    communicated to Spot's attorneys, which attorneys allegedly received Exhibit A, or when its contents

7    were allegedly discussed. (*See id.*)  Without such facts the Burnham declaration is a conclusory

8    "blanket assertion" of the attorney-client privilege, which the Ninth Circuit extremely disfavors.

9    *Martin*, 278 F.3d at 1000.

10          In sum, Spot has failed to satisfy its burden of demonstrating that Exhibit A is entitled to

11   protection under the attorney-client privilege.  The document's four corners do not demonstrate that

12   it is entitled to protection.  Further, Spot's repeated assertions during oral argument and in its brief that

13   it has an "e-mail between Seed IP and Spot Devices on May 24, 2005 discussing the contents of

14   Exhibit A" is flatly contradicted by the actual contents of the May 24, 2005, email.  Despite Spot's

15   various representations and promises of reliable evidence, Exhibit A is precisely what it at first glance

16   appears to be: an internal business memorandum written by a Spot employee for a Spot employee,

17   which Spot inadvertently produced and, now, cannot retrieve.

18          Spot has failed to carry its burden of establishing the applicability of the attorney-client

19   privilege with regard to Exhibit A.

20   **B.     *Exhibit A is not Protected by the Work Product Doctrine***

21          Spot further asserts that Exhibit A is protected by the work product doctrine.  The gist of Spot's

22   argument is that because Exhibit A was created one month after LightGuard informed Spot that Spot

23   may be infringing LightGuard's patents, the court should infer that Exhibit A was created in

24   anticipation of litigation. (Def.'s Suppl. Br., Doc. #121 at 2-3.)  Where dual-purpose documents are

25   involved, that is documents that serve both business and litigation purposes, courts apply the "because

26

27          [3] On December 30, 2011, Spot submitted its first privilege brief. (Doc. #109.)  On January 19, 2012,

28   the court issued an order requesting Spot to clarify why it believed Exhibit A was privileged. (Doc. #115.)
     On January 30, 2012, Burnham executed the Burnham declaration. (Doc. #122.)

of" test when determining whether the work product doctrine applies. *Richey*, 632 F.3d at 567-68 (citing *In Re Grand Jury Subpoena*, 357 F.3d at 907). Under the "because of" test, the party seeking protection must demonstrate that the document was created because of impending litigation. *Id.* Spot has not satisfied this test.

First, the plain language of Exhibit A's introduction, which memorializes Exhibit A's purpose and the context of its creation, makes no mention of impending litigation. (*See* Joint Stip. Ex. List, Doc. #105 at Ex. A.) Rather, Exhibit A explicitly states that it was created for the business purpose "of reducing the number of constraints on Spot Devices' future designs." (*Id.*) Importantly, the introduction memorializing the context of Exhibit A's creation makes no mention of LightGuard or impending litigation. (*Id.*) Furthermore, the inclusion of the final two words, "future designs" is significant because it rebuts Spot's contention that the memo was written in response to Spot's current or past designs, which form the subject matter of this lawsuit.

Second, although plausible in theory, Spot's contention that the temporal proximity between LightGuard's notice of potential litigation and Exhibit A's creation indicates that Exhibit A was created in anticipation of litigation fails on the facts. (Def.'s Suppl. Br., Doc. #121 at 2-3.) As noted above, Exhibit A's introduction clearly states that it was prepared for the business purpose of "reducing the number of constrains on Spot Devices' future designs." (Joint Stip. Ex. List, Doc. #105 at Ex. A.) This fact alone undermines Spot's attempt to link Exhibit A's creation with LightGuard's notice of potential litigation. As a result, the court cannot conclude that the temporal proximity between LightGuard's notice of potential litigation and Exhibit A's formulation demonstrates that Exhibit A was created in anticipation of litigation.

In sum, whether judged by the general rule or the "because of" test, the work product doctrine requires the party asserting protection to somehow link the disputed document with the prospect of impending litigation. Spot failed to do this for two reasons. First, Spot's Exhibit A states on its face that it was created for business purposes. Second, Spot's argument, which relies exclusively on temporal proximity, ignores what Exhibit A states on its face: that it was created for the business

/ / /

/ / /

14

1    purpose of "reducing the number of constraints on Spot Devices' *future designs*." (Joint Stip. Ex. List,

2    Doc. #105 at Ex. A; emphasis added.)

3         Exhibit A is not, therefore, entitled to protection under the work product doctrine.

4    **C.    *Exhibits B-L are not Protected by the Attorney-Client Privilege***

5         LightGuard and Spot further dispute whether the attorney-client privilege protects a number

6    of discrete statements found in operating plans, sales and financial reports, and PowerPoint

7    presentations, which Spot presented to its board of directors. (*See* Doc. #107 at 10-13; Doc. #109 at

8    8-9.)  As with Exhibit A, Spot bears the burden of demonstrating that the statements found in

9    Exhibits B-L are entitled to protection.  *Martin*, 278 F.3d at 999-1000.  Spot, however, erroneously

10   argues the secondary issue of whether LightGuard waived the ability to contest any purported privilege

11   which might attach to Exhibits B-L.  The court cannot conclude that Spot has satisfied its burden of

12   demonstrating that the attorney-client privilege protects the statements in Exhibits B-L from

13   disclosure.

14        In both its briefs, and at the February 15, 2012, hearing, Spot predicates its assertion that the

15   statements in Exhibits B-L are protected by the attorney-client privilege on the existence of an oral

16   agreement between Spot and LightGuard.  (Doc. #109 at 8:18-25; Doc. #121 at 4:16-18.)  According

17   to Spot, Spot allegedly agreed to leave Exhibits B-L unredacted for LightGuard's use during a

18   deposition in exchange for LightGuard's promise that LightGuard would not allege that Spot waived

19   the privilege by leaving the documents unredacted.  (*Id*.)  Spot further contends that the terms of the

20   agreement extended beyond the use of the unredacted document during the deposition and prohibited

21   any prior or future use of the unredacted document.  (Doc. #109 at 8:18-25; Doc. #121 at 4:16-18.)

22        Several problems beset Spot's position.  First, the deposition transcript memorializing the

23   alleged agreement only specifically identifies one exhibit.  (*Id*. ("MR. HEMMINGER: 'Over the break

24   we were able to resolve – reach an agreement as to how to 'go forward at least with respect to

25   Exhibit 821'").)  Allusions are made to "other documents" but none are identified.  (*Id*. at 6:19-25,

26   7:1-8.)  The court is, therefore, invited to speculate which, if any, of the exhibits docketed as

27   Exhibits B-L is Exhibit 821 and whether the "other documents" alluded to are, in fact, the remaining

28   documents docketed as Exhibits B-L.  Spot, however, offers no explanation for these discrepancies.

1   As a result, the court is reluctant to hold LightGuard to an agreement limiting the legal arguments at

2   its disposal when the exact documents subject to the agreement were not identified on the record.

3          Second, assuming LightGuard and Spot reached an agreement, its terms are facially ambiguous.

4   The deposition transcript indicates that the parties discussed the possibility of coming to an agreement

5   throughout the morning and that they disagreed on the agreement's duration.  (*See* Doc. #121-1 at

6   4:20-23,  5:2-5  ("MR. McMILLEN: 'For  purposes  of  today's  deposition,  that's  fine.'

7   MR. HEMMINGER: 'No, no, no.  It's not for today's, it's forever.'").)  When the alleged agreement

8   was reached, however, the parties were off the record and Spot failed to memorialize the agreement's

9   terms on the record.  (*See Id*. at 6:11-17.)  There is, as a result, nothing on the record to corroborate

10  Spot's position that the alleged agreement was "forever" or any evidence to rebut LightGuard's

11  assertion that it was not.

12         Third, Spot's perseveration on the alleged agreement, which concerns the issue of waiver, is

13  inapposite.  Under the terms of the alleged agreement, LightGuard merely agreed to allow the

14  deposition to continue on the condition that any examination of witnesses regarding the documents

15  would not constitute a wavier, if any, of the attorney-client privilege.  Importantly, LightGuard did not

16  agree that the attorney-client privilege even attached to the documents.  As a result, Spot still bears the

17  burden of demonstrating that the statements, in the first instance,  are in fact privileged. *Martin*, 278

18  F.3d at 999–1000 (stating the burden of proving whether the privilege exists rests on the party asserting

19  the privilege); *see also Weil*, 647 F.2d at 24 (stating that the privilege is strictly construed).  Spot has

20  failed to satisfy this burden for several reasons.

21         Spot contends that the statements in Exhibits B-L are entitled to protection because they reveal

22  "the subject matter of the legal advice sought or matters on which legal advice was sought."  (Doc.

23  #119 at 5:3-4.)  The attorney-client privilege, however, protects confidential communications, not

24  "subject matters."   *Graf*, 610 F.3d at 1156; *see also Upjohn Co.*, 449 U.S. at 395-96 (quoting

25  *Philadelphia v. Westinghouse Elec. Corp*., 205 F.Supp. 830, 831 (D.Pa. 1962) ("[T]he protection of

26  the privilege extends only to communications and not to facts. A fact is one thing and a

27  communication concerning that fact is an entirely different thing".)  8 Wigmore, Evidence § 2292

28  (1961).

1    Further, Spot has failed to proffer any argument that the disputed statements qualify as

2    communications to counsel seeking legal advice. (*See* Def.'s Supp. Br., Doc. #121; (Def.'s Opp'n

3    Doc. #109.) Rather, in both its briefs and during the February 15, 2012, hearing, Spot relied on

4    inapposite case law, which again addressed the issue of waiver. *See PG&E v. United States*, 69 Fed.

5    Cl. 784, 811 (Ct. Cl. 2006) (noting that a company's disclosure of information to its board of directors

6    does not waive the attorney-client privilege); *Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau*,

7    150 F.R.D. 193, 198 (D. Kan. 1993) (noting the same); *Jones v. Nat'l Counsel of YMCA of the USA*,

8    No. 09-C-6437, 2011 WL 170122, at *2 (N.D. Ill May 3, 2011) (noting the same) (cited in (Doc. #109

9    at 8:27:28, 91-7).

10   Finally, even if Spot properly formulated its argument, the exhibits would not be entitled to

11   protection because there is no indication that the disputed statements seek legal advice. When

12   determining whether a document seeks legal advice, courts have examined the nature, content, and

13   context in which the document was prepared. *AT&T Corp.*, 2003 WL 21212614 at *3 (N.D. Cal.

14   2003) (citation omitted). Here, the nature, content, and context of Exhibits B-L militate against

15   protection.

16   With regard to the *nature* of the exhibits, all are internal documents that were created to present

17   to Spot's board of directors. (Doc. #105 at Ex. B-L.) There is, as a result, no evidence suggesting that

18   Exhibits B-L were created with an intent to seek legal advice and no evidence suggesting that the

19   exhibits were actually used to obtain legal advice. The *content* of the exhibits similarly militates

20   against protection. Although a number of the contested statements address LightGuard's patents (*e.g.*,

21   "design concept development as work around for LG patent;" "Evaluate LG Patent;" "LG patent

22   situation – implications for Product Development"), none of the statements indicate that the exhibits

23   were created to obtain legal advice and, significantly, none can be reasonably construed as

24   communications. (*See id*.) Finally, the *context* of the exhibits' preparation also militates against

25   protection. By Spot's own admission (*see id*.), Exhibits B-L are a collection of operating plans, sales

26   and financial reports, and PowerPoint presentations that were presented to Spot's board of directors.

27   (Doc. #109 at 8:24.) The court cannot, as a result, discern any evidence indicating that the exhibits

28   were created to seek legal advice.

1   In conclusion, Spot has failed to demonstrate that Exhibits B-L are protected by the attorney-

2   client privilege.  Although its arguments fail for a variety of reasons as addressed above, Spot's failure

3   can be briefly summarized by two points.  First, in both its briefs and at oral argument, Spot

4   unconvincingly argued that Exhibits B-L are protected by an oral agreement between LightGuard and

5   Spot.  However, even if the court accepted Spot's version of the alleged agreement, which it does not,

6   the agreement is inapposite because it only addresses the issue of waiver.  According to Spot,

7   LightGuard orally agreed to allow the deposition to continue on the condition that any examination

8   of witnesses regarding the documents would not constitute a general wavier of the attorney-client

9   privilege.  Significantly, nothing in the alleged agreement demonstrates that the attorney-client

10   privilege attached.

11   This brings the court to Spot's second major failing, namely, Spot failed to establish that the

12   disputed statements in Exhibits B-L qualify as communications to counsel seeking legal advice.  (*See*

13   Def.'s Supp. Br., Doc. #121; Def.'s Opp., Doc. #109.)  Rather, in both its briefs and during the

14   February 15, 2012, hearing, Spot relied on inapposite case law, which again addressed the issue of

15   waiver.  *See, e.g.*, *PG&E*, 69 Fed. Cl. at 811 (discussing waiver).  The key question to begin with is

16   whether the exhibits are protected by the attorney-client privilege, which they are not.

17   As a result, Spot has failed to satisfy its burden.  The court, therefore, concludes that

18   Exhibits B-L are not protected by the attorney-client privilege.

19   **D.   Certain Documents Identified in Exhibit M not Privileged**

20   LightGuard and Spot's final privilege dispute involves Spot's privilege log, Exhibit M, which

21   consists of fifty-three emails and attachments docketed as sub-exhibits 1-50, 71-73.  (Doc. #131.)

22   During the February 15, 2012, hearing, LightGuard and Spot presented arguments as to whether

23   Exhibit M complied with the factors governing privilege logs as articulated by *Dole v. Milonas*, 889

24   F.2d 885, 888 n.3 (9th Cir. 1989) and *In re Grand Jury Investigation*, 974 F.2d 1086, 1071 (9th Cir.

25   1989).  Because the court was unable to determine whether the documents referenced in the log

26   complied with Ninth Circuit precedent, the court ordered Spot to produce the documents listed in

27   / / /

28   / / /

1    Exhibit M for *in camera* review.[4]  On February 23, 2012, Spot filed the documents listed in Exhibit M

2    and the May 24, 2005, email for *in camera* review.  (*See* Doc. #131.)

3             After reviewing Spot's briefs, exhibits, and considering its arguments, the court concludes that

4    the documents identified in Exhibit M are entitled to protection under the attorney-client privilege with

5    the exception of the following nine exhibits:

6             ***First***, Exhibit 2, which is an email from Chris Peddie to Thomas Burnham dated September 9,

7    2005, regarding "V2 & LG" (Doc. #131, Ex. 2);

8             ***Second***, Exhibit 10, which is an email from Dave Bim-Merle to Thomas Burnham dated

9    September 26, 2005, regarding "Patent" (Doc. #131, Ex. 10);

10            ***Third***, Exhibit 11, which is also an email from Dave Bim-Merle to Thomas Burnham dated

11   September 26, 2005, regarding "Patent" (Doc. #131, Ex. 11);

12            ***Fourth***, Exhibit 20, which is an email and attachment from Chris Peddie to Thomas Burnham

13   dated October 4, 2005, regarding "Flush Road Maker Patent.doc" (Doc. #131, Ex. 20);

14            ***Fifth***, Exhibit 21, which is an email from Chris Peddie to Thomas Burnham dated October 4,

15   2005, regarding "Varga" (Doc. #131, Ex. 21);

16            ***Sixth***, Exhibit 27, which is an email from Chris Peddie to Thomas Burnham dated

17   November 14, 2005, regarding "FW: Supercapacitor proposal for solar road warning light" (Doc. #131,

18   Ex. 27);

19            ***Seventh***, Exhibit 43, which is an email from Thomas Burnham to Chris Peddie dated July 1,

20   2010, regarding "Lightguard" (Doc. #131, Ex. 43);

21            ***Eighth***, Exhibit 47, which is an email from Chris Peddie to Sandi Dunymer dated July 1, 2010,

22   regarding "LG Letter" (Doc. #131, Ex. 47); and,

23            ***Ninth***, Exhibit 48, which is an email from Chrid Peddie to Sandi Dunymer dated July 2, 2010,

24   regarding "LG Letter" (Doc. #131, Ex. 48.)

25

26   _____

27        [4] The court's review of Exhibit M and the documents Spot produced for *in camera* review was made
     difficult by Spot's failure to provide any information concerning the identity of the emails' authors.  Whether
28   the authors were LightGuard employees, Spot employees, or attorneys remained open questions Spot left for
     the reader of the log–and the court–to decipher.

*Additionally*, as discussed above, *see supra* pp. 11-12, the court concludes that Exhibit 73, which is an email from Frank Abramonte to Timm Peddie, Thomas Burnham, and Peter Dyer dated May 24, 2005, regarding "packet"(Doc. #131, Ex. 73), is not entitled to protection under the attorney-client privilege.

The court reiterates that Spot had the burden of demonstrating that the documents are entitled to protection. *See Martin*, 278 F.3d at 999–1000 (holding that the party asserting the attorney-client privilege bears the burden of demonstrating each element); *see also Tornay*, 840 F.2d at 1426 (stating that the party asserting the work product doctrine bears the burden of demonstrating that it applies). The ten aforementioned documents are not entitled to protection because they either do not seek legal advice or communicate with counsel. Spot's brief (Doc. #131) offered the court no guidance as it did not argue why the documents are entitled to protection. The court, however, will retain the identified documents under seal in order to afford Spot the opportunity to object to the court's conclusions regarding the identified documents. All other documents that Spot produced for the court's *in camera* review, Exhibits 1, 3-9, 12-19, 22-26, 28-42, 44-46, 49-50, and 71-72, are privileged and need not be produced to LightGuard.

### E.   The Payment Dispute

The facts underlying LightGuard and Spot's second discovery dispute, which concerns fees owed to a discovery vendor, are recounted above. *See*, *supra*, Section I.B. LightGuard and Spot's payment dispute sends the parties down a well-worn path. Federal Rule of Civil Procedure 34(a)(1) provides that "[a] party may serve on any other party a request" to "produce and permit the requesting party or its representative to inspect, copy, test, or sample ... any designated document or electronically stored information. Fed. R. Civ. Pro. 34(a)(1). When responding to such a request, "the presumption is that the producing party should bear the cost of responding to properly initiated discovery requests[.]" *Oppenheimer Fund, Inc.*, 437 U.S. at 358.

However, this presumption neither abrogates the general presumption that each party bears the "ordinary burden of financing his own suit" nor burdens the responding party with photocopying expenses. *Eisen*, 417 U.S. at 94; *see also Tierno*, No. 05-02520, 2008 WL 3876131 at *1 (N.D. Cal. Aug. 19, 2008) (citing 7 *Moore's Federal Practice* § 34.13[5] at 34-92 (2008) (addressing the

requesting party's duty to pay photocopying expenses)).  As the plain language of Rule 34(a)(1) indicates, the responding party is required to produce the documents for copying, not the funds to finance the documents' photocopying.  *See* Fed. R. Civ. Pro. 34(a)(1).

LightGuard's allegation that Spot is liable for half of the photocopying expenses is unsubstantiated by law and fact.  First, LightGuard misunderstands the law governing document production.  In support of its contention that Spot is liable for half of the photocopying expenses arising from Sierra Legal's services, LightGuard cites a number of cases that refer to the Supreme Court's statement in *Oppenheimer Fund, Inc.* that the "producing party should bear the cost of responding to properly initiated discovery requests." 437 U.S. at 358; *see* Doc. #123 at 2:4-14 (citing *Mezu v. Morgan State Univ.*, 269 F.R.D. 565, 575 (D. Md. 2010); *United States v. Columbia Board Sys. Inc.*, 666 F.2d 364, 371 (9th Cir. 1982); *In re Grand Jury No. 76-3 (MIA Subpoena Duces Tecum*, 555 F.2d 1306, 1308 (5th Cir. 1977)).

LightGuard's citation to *Oppenheimer Fund, Inc.* is inapposite because *Oppenheimer Fund, Inc.* addresses costs associated with *responding* to discovery requests.  *Id.*  As described in *In re Puerto Rico Elec. Power Authority*, 687 F.2d 501, 508 (P.R. Cir. 1982), responding to discovery requests includes answering interrogatories, submitting to depositions, and producing documents for the other party's inspection, copying, testing, or sampling.  *Id.*  Expenses associated with photocopying are, in other words, in a different realm than the expenses associated with responding to requests addressed by the Supreme Court in *Oppenheimer Fund, Inc.*

Even if *Oppenheimer Fund, Inc.* addressed photocopying expenses, which it did not, the Supreme Court gave no indication that it was abrogating the more general presumption that each party bears the "ordinary burden of financing his own suit."  *Eisen*, 417 U.S. at 94.  Rather, the law governing discovery requests and document production clearly states that the requesting party bears expenses associated with photocopying.  *See Tierno*, No. 05-02520, 2008 WL 3876131 at *1 (N.D. Cal. Aug. 19, 2008) (citing 7 *Moore's Federal Practice* § 34.13[5] at 34-92 (2008) ("A party producing documents will ordinarily not be put to the expense of making copies for the requesting party")); *see also Bills v. Kennecott Corp.* 108 F.R.D. 459, 462 (D. Utah 1985) ("Ordinarily, the producing party bears the costs of reviewing and gathering documents while the requesting party pays

1   for the costs of the copies only"); *Clear View Investments, Ltd. v. Oshatz*, 233 F.R.D. 393, 394

2   (S.D.N.Y. 2006) (stating the same); *Obiajulu v. City of Rochester, Dept. of Law*, 166 F.R.D. 293, 297

3   (W.D.N.Y. 1996) (stating the same).

4          Second, LightGuard's allegation that Spot is liable for half of the photocopying expenses is

5   unsubstantiated by the facts.  Although Federal Rule of Civil Procedure 34, *Oppenheimer Fund, Inc.*

6   and *Eisen* establish the general rule that the responding party is responsible for costs associated with

7   responding to requests while the requesting party is responsible for subsequent costs, including

8   photocopying, these are merely default rules, which the parties can contractually alter.  *See, e.g.*,

9   *Bobrosky v. Vickers* 170 F.R.D. 411, 415 (W.D. Va. 1997) (discussing how parties may alter discovery

10  procedures in the context of Rule 29.)  LightGuard, however, has provided no evidence indicating that

11  the parties actually agreed to alter the default rules.  On the contrary, the evidence demonstrates that

12  Spot repeatedly rejected LightGuard's cost sharing proposal.  (*See, e.g.*, Doc. #126-2 at 2; Doc. #126-3

13  at 2; Doc. #126-4 at 3; Doc. #126-7 at 2 (stating Spot will "not incur the cost of making copies in this

14  litigation").)  As a result, he court cannot conclude that LightGuard and Spot reached a meeting of the

15  minds concerning cost sharing for photocopying expenses.

16          The law clearly states that the responding party is only responsible for costs associated with

17  responding to requests for production whereas the requesting party is responsible for subsequent costs.

18  Because LightGuard has not established a meeting of the minds between LightGuard and Spot to

19  contractually alter the law's default discovery rules, the court determines that Spot is only liable for

20  the costs associated with converting the documents into LightGuard's requested format whereas

21  LightGuard is responsible for expenses arising from Sierra Legal's photocopying services.  (Doc.

22  #127.)

23                                     **IV.  CONCLUSION**

24          In conclusion, Spot has failed to demonstrate that Exhibit A is entitled to protection under

25  either the attorney-client privilege or the work product doctrine.  It has also failed to demonstrate that

26  Exhibits B-L, as well as the ten aforementioned sub-exhibits identified in Exhibit M, are entitled to

27  protection under the attorney-client privilege.

28  / / /

1       LightGuard has failed to demonstrate that Spot agreed to equally apportion expenses associated

2  with photocopying Spot's production.

3       IT IS THEREFORE ORDERED that, with regard to Exhibits A-L and sub-exhibits 2, 10, 11,

4  20, 21, 27, 43, 47, 48, and 73 identified in Exhibit M, LightGuard's Emergency Motion to Compel

5  (Doc. #74) is **GRANTED**.[5]

6       IT IS FURTHER ORDERED that LightGuard's motion to apportion photocopying expenses,

7  which came before the court during a January 24, 2012, status conference (Doc. #118) is **DENIED.**

8       **IT IS SO ORDERED.**

10       DATED:   March 9, 2012.

12  _____
     WILLIAM G. COBB
     UNITED STATES MAGISTRATE JUDGE

[5] These documents shall remain under seal to afford Spot the opportunity to object.